**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

_____

PETER J. TAVARES,

                                          Plaintiff,

              v.                                                    No. 12-CV-563
                                                                          (TJM/CFH)

MICHAEL J. AMATO, Sheriff; MICHAEL
FRANKO, Jail Administrator;

                                          Defendants.

_____

**APPEARANCES:**                                   **OF COUNSEL:**

PETER J. TAVARES
Plaintiff Pro Se
Riverside Motel
2 Riverside Drive
Fultonville, New York 12072

LAW OFFICE OF THERESA PULEO          MURRY S. BROWER, ESQ.
Attorney for defendants
Post Office Box 12699
Albany, New York 12212

**CHRISTIAN F. HUMMEL
U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff pro se Peter J. Tavares ("Tavares"), an inmate recently released from custody,

brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, the Montgomery

County Sheriff and Jail Administrator, violated his constitutional rights under the First and

Fourteenth Amendments.  Compl. (Dkt. No. 1).  Presently pending are (1) Tavares' motion

for summary judgment and (2) defendants' cross-motion for summary judgment both

pursuant to Fed. R. Civ. P. 56.  Dkt. Nos. 23, 26.  Both motions are opposed.  Dkt. Nos. 26,

_____

        [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

29.  For the following reasons, it is recommended that (1) Tavares' motion be denied and (2) defendants' motion be granted in part and denied in part.

## I. Background

## A. Involuntary Protective Custody

Revised in January 2010, Montgomery County Correctional Facility ("Montgomery") had a specific policy regarding administrative segregation for protective custody.  Dkt. No. 26-1 at 81.  After an inmate had undergone screening and classification, he could be assigned to protective custody, being locked in his cell for twenty-three hours a day for a sixty day period of time.  Id. at 84.  However, the inmate could seek review of said classification, through a written request to the jail administrator, after sixty days provided "there [wa]s no further threat to [the inmate's] safety . . . ."  Id.  If such a threat remained, the inmate's situation may be re-evaluated every thirty days until such time as the threat dissipated.  Id.

On November 3, 2011, Tavares entered Montgomery after his parole was revoked. Tavares Aff. (Dkt. No. 23-1 at 1-2) at 1; Franko Aff. (Dkt. No. 26 at 47-53) ¶ 2.  Upon arrival, all inmates are processed and evaluated for placement in the appropriate housing unit consistent with the policy outlined above.  Franko Aff. ¶ 3; Id. ¶ 6 (explaining that classification officers consider an inmate's "past criminal history [and] . . . information if that person has been in the jail on other occasions," as well as interviewing the inmate).  With respect to Tavares, his classification was determined after evaluating "the charges pending and the past history of sex-related based offenses which involved violence, all based on the system established by the jail . . . to make the classification as objective as possible . . . ."

2

Franko Aff. ¶ 4; <u>see</u> <u>also</u> Dkt. No. 26 at 58 (inmate classification sheet); Dkt. No. 26-1 at 6-7 (offender details).

After spending five days undergoing classification, on November 8, 2011, Classification Officer Payne administratively segregated Tavares into Involuntary Protective Custody ("IPC") due to his sex offender status. Compl. at 5; Tavares Aff. at 1; Franko Aff. ¶¶ 3-4; <u>see</u> <u>also</u> Dkt. No. 26 at 58-59 (concluding after filling out inmate classification sheet that Tavares required IPC for his own personal safety); Dkt. No. 29 at 18 (same). As a sex offender, Tavares was "considered to be in a group that most likely may be victimized and was segregated from inmates housed in the general population." Franko Aff. ¶ 4. When he was transferred to IPC, Tavares was given a copy of the form which indicated his classification and the reasons for such, which he refused to sign. Franko Aff. ¶ 4; Dkt. No. 26 at 60.

"In the late fall of 2010 and continuing into the winter and spring of 2011[] the inmate population of Montgomery . . . was growing[; thus] the Sheriff and [Administrator] began to discuss how the rising population might impact the safety of inmates and . . . of corrections officers assigned to the various pods . . . . " Franko Aff. ¶ 8. Specifically during this time period, there was "a rise in the population of sex offenders[, which] . . . was a concern given that sex offenders are often victimized in a correction setting when housed in the general population." Franko Aff. ¶ 9. This also caused a concern for the safety of the correctional staff "who intervene to break up fights and provide a higher level of protection to the vulnerable population." Franko Aff. ¶ 9.

While in IPC, it is undisputed that Tavares was locked in his cell for twenty-three hours a day, with one hour of recreation during which he could use the phone or shower. Compl. at

4; see also Franko Aff. ¶ 10 (confirming that the sex offenders were locked down for twenty

three hours a day because "[w]hile [defendants] would have liked to have given each of the

persons housed at the jail the ability to move about the pod, this was not possible because

of the number of persons the facility was housing and . . . the then current staffing levels.");

Id. ¶ 11 ("While in [IPC, inmate] . . . were allowed out of their cells for one hour each day for

recreation, showers, etc."). Tavares never violated any disciplinary rules and was upset

with his inability to move about the housing unit, restricted ability to shower and have

access to various amenities, necessity to choose between those available privileges which

were limited and only available for an hour a day, and attend religious services. Compl. at

4-5; Dkt. No. 29 at 5. Moreover, Tavares contends that religious figures came to

Montgomery to worship with general population inmates and the IPC inmates were never

permitted to attend such services. Dkt. No. 29 at 5.

   Defendants emphatically state that placement in IPC was not punitive, but prophylactic.

Franko Aff. ¶ 14. Further, defendants assert that IPC inmates were not limited on their

abilities to engage in religious activities as they "were free to request to practice religion and

to have religious based visits from pastors and the like." Franko Aff. ¶ 12; see also Dkt.

No. 26-1 at 88 (facility rulebook which states that Montgomery "when possible, [would]

make available to all inmate a range of religious services and programs."). Defendants also

contend that IPC inmates could participate in educational activities, just not with those

inmates in general population, have access to the law library, and participate in visits with

their attorneys. Franko Aff. ¶¶ 13, 17, 18; compare Dkt. No. 26 at 87 (approved request to

go to the law library on February 21, 2012); Dkt. No. 29 at 6 (admitting that defendants

allowed Tavares one hour in the law library) with Dkt. No. 26 at 66-86 (seventeen granted

4

requests for either the law library, legal call, or notary republic for the three and a half month period directly after Tavares was reclassified out of IPC).

In January of 2012, Tavares filed a grievance about his placement in IPC based solely on his sex offender status.  Tavares Aff. at 1.[2]  The grievance was returned with a statement from defendant Jail Administrator Franko that Tavares was placed in IPC for his own safety due to his criminal history and designation as a sex offender.  Tavares Aff. at 1; see also Franko Aff. ¶ 10 (explaining that due to an influx in the inmate population, specifically the sex offenders, Amato decided "that the way to provide adequate protection . . . was to separate the sex offenders and place them in protective custody.").  Classification designations are not grievable.  Franko Aff. ¶ 15.  On February 15, 2012 Tavares' grievance was forwarded to the Citizen Complaint and Review Board.  Tavares Aff. at 1.

On March 13, 2012 the State Commission of Corrections authored a letter to defendant Franko stating that:

> inmates who are in Protective Custody (PC) and are not confined
> due to disciplinary reasons, or bona fide safety and security
> reasons (administrative segregation order with written
> documentation), should not be locked in for extended periods of
> time.  Inmates in PC should have the same rights and privileges as
> the general population.

Dkt. No. 23-1 at 5; see also Franko Aff. ¶ 20 (acknowledging receipt of the March 13th letter)[3].  After receiving the letter, defendant Franko instructed Classification Officer Payne

---

[2] Tavares contends that he filed additional grievances and appeals regarding his classification to defendant Franko; however, there are no such documents included in the discovery which was provided in conjunction with the present motion.  Dkt. No. 29 at 6.

[3] While this response was not in regards to Tavares, but another inmate, it is still relevant to determining the present motion.

5

to review Tavares' designation. Franko Aff. ¶ 15. On March 19, 2012, after spending 132

days in IPC, Officer Payne overrode the classification system and Tavares was reclassified

and removed from IPC. Compl. at 6; Franko Aff. ¶ 20; Dkt. No. 26 at 61-62; Dkt. No. 29 at

22-23. While Franko directed the reevaluation of Tavares' classification, he contends that

neither Amato nor Franko "were involved in the classification process." Franko Aff. ¶ 20.

Defendants assert that Tavares' placement in IPC was not discriminatory, but rather due

to "the score he received on the classification evaluation forms which took into account the

current charges levied against him and his prior convictions for a sex based crime . . . . [as

well as] the administrative needs of the facility . . . [to insure] the safety of the persons at

the jail and the corrections officers . . . ." Franko Aff. ¶ 19.


## B. Prior Incarcerations and Classifications

Tavares was previously incarcerated at Montgomery. On October 7, 1999, Tavares was

classified requiring general supervision. Dkt. No. 26-1 at 38-39; Dkt. No. 29 at 9-10. At that

time, the classification sheet did not include separate criteria from sexual offenses, only

violent or non-violent crimes. Dkt. No. 26-1 at 38-39 (classifying Tavares in general

population with a total score of five points); Dkt. No. 29 at 9-10. On November 29, 2005[4],

Tavares was again incarcerated at Montgomery. Dkt. No. 26-1 at 43-46; Dkt. No. 29 at 11-

13. The classification form indicates that Tavares was given points for various violent

---

[4] On the heading of the classification forms there is both a handwritten date, November 29, 2005, and a computer generated date, December 20, 2002. Dkt. No. 26-1 at 43; Dkt. No. 29 at 11. Given Tavares' assertions that his prior incarcerations occurred in "1999, 2005, [and] 2010," (Dkt. No. 29 at 3) the Court used the handwritten date in its analysis.

sexual offenses (twenty five points for having a current violent felony or sex offense and twenty points for having a violent felony or sex offense in his prior criminal history) , scored 105 on the classification form, and was identified as needing maximum supervision; however, despite the same prior convictions and sex offender status, Tavares was not classified as a victim and IPC was not deemed necessary. Dkt. No. 26-1 at 43-46; Dkt. No. 29 at 11-13. On July 1, 2010, Tavares again underwent classification at Montgomery. Dkt. No. 26-1 at 72-75; Dkt. No. 29 at 14-17. The classification form again provided Tavares with points for violent sexual offenses (twenty points for having a violent felony or sex offense in his criminal history), gave him a total score of approximately 42, indicated that Tavares was not a victim, and deemed IPC unnecessary. Dkt. No. 26-1 at 72-75; Dkt. No. 29 at 14-17.

When Tavares was again incarcerated in conjunction with the present claims, the classification form provided Tavares with points for prior violent felonies or sex offenses (twenty points for having a violent felony or sex offense in his criminal history), gave him a score of 52 points, and indicated that IPC was necessary for his own personal safety. Dkt. No. 26 at 58-59. When Tavares was re-classified in March of 2012, his score was 54 (again providing him twenty points for having a violent felony or sex offense in his criminal history) and the notation indicated that Tavares was removed from IPC via an override for the system. Dkt. No. 26 at 61-62.

## II. Discussion

In his complaint, Tavares alleges that his First Amendment rights were violated by his inability to access the law library and engage in religious worship while confined in IPC.

7

Also, Tavares contends that he was discriminated against and placed in IPC because he was a sex offender in contravention of the Equal Protection Clause of the Fourteenth Amendment.  Tavares also contends that his Due Process rights were violated by his unconstitutional segregation into IPC.  Also, liberally reading his complaint and cross-motion, Tavares has alleged various Eighth Amendment violations for his conditions of confinement including the frequency and availability of showers, being locked in his cell for twenty-three hours a day, and inaccessibility to programming and television.  Defendants seek dismissal contending that (1) Tavares' constitutional claims are meritless and (2) defendants are entitled to qualified immunity.

### A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law.  The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial.  The non-moving party must do more than merely show that there is some doubt or

speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247–48.

When considering cross-motions for summary judgment, a court "must evaluate each

party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Hotel Employees & Rest. Employees Union, Local 100 of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002) (quoting Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it . . . [and] a district court is not required to grant judgment as a matter of law for one side or the other." Heublein, Inc. v. United States, 996 F.2d at 1461.

## B. First Amendment

### 1. Law Library

The Supreme Court has held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries . . . ." Bounds v. Smith, 430 U.S. 817, 828 (1977); see also Lewis v. Casey, 518 U.S. 343, 351 (1996). This right is not unlimited and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program was subpar in some theoretical sense." Lewis, 518 U.S. at 351. Thus, in order to demonstrate an actionable injury, "a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury." Vega v. Artus, 610 F. Supp. 2d 185, 201 (N.D.N.Y. 2009) (citations omitted); see also Lewis, 518 U.S. at 351-52 (explaining the actual injury requirement).

In this case, Tavares has failed to allege a First Amendment violation. While Tavares

may have raised a question of material fact with respect to the first prong of the analysis,

relying on the record which showed Tavares only had one documented trip to the law library

during his IPC confinement, as opposed to seventeen after his release, Tavares has failed

to state any type of actual injury which occurred as a result of the apparent discrepancy in

access to the law library experienced by those in IPC. Tavares has failed to identify which

legal claims were frustrated, if they were meritorious, and how that research would have

supported the viability of such claims. In the absence of any evidence that Tavares

suffered any actual injury precluding him from pursuing any judicial action, defendants'

motion as to any claimed deficiency in Tavares' access to Montgomery's law library should

be granted. See Christopher v. Harbury, 536 U.S. 403, 415 (2002) ("[T]he underlying cause

of action . . . is an element that must be described in the complaint, just as much as

allegations must describe the official acts frustrating the litigation.").


## 2. Religious Services

The First Amendment protects the right to free exercise of religion. See generally Cutter

v. Wilkinson, 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain

some measure of the constitutional protection afforded by the First Amendment's Free

Exercise Clause." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v.

Procunier, 417 U.S. 817, 822 (1974)).

> To assess a free exercise claim, a court must determine (1)
> whether the practice asserted is religious in the person's scheme of
> beliefs, and whether the belief is sincerely held; (2) whether the
> challenged practice of the prison officials infringes upon the
> religious belief; and (3) whether the challenged practice of the

11

prison officials furthers some legitimate penological objective.

Farid v. Smith, 850 F.2d 917, 926 (2d Cir. 1988) (citations omitted). This right is not

absolute and can be limited due to the inmate's "incarceration and from valid penological

objectives – including deterrence of crime, rehabilitation of prisoners, and institutional

security." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted);

see also Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard

is one of reasonableness, taking into account whether the particular regulation . . . is

reasonably related to legitimate penological interests.") (citations omitted).

> The Turner Court determined that the four factors to be considered
> are: 1) whether there is a rational relationship between the
> regulation and the legitimate government interests asserted; 2)
> whether the inmates have alternative means to exercise the right;
> 3) the impact that accommodation of the right will have on the
> prison system; and 4) whether ready alternatives exist which
> accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987).

""[P]risoners have a constitutional right to participate in congregate religious services."

Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993) (citations omitted). "Confinement

in keeplock does not deprive prisoners of this right." Id. (citations omitted). While the

Second Circuit has accorded prison officials great deference in the administration and

"responsibility of maintaining order in prisons, . . . prisoners should be afforded every

reasonable opportunity to attend religious services, whenever possible." Young v.

Coughlin, 866 F.2d 567, 570 (2d Cir. 1989) (citations omitted). "The governing standard is

one of reasonableness, taking into account whether the particular regulation affecting some

constitutional right asserted by a prisoner is reasonably related to legitimate penological

interests." Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) (citations omitted). The

same analysis is undertaken when there is an allegation that "an individual dec[ided] to deny a prisoner the ability to engage in some requested religious practice." Ford, 352 F.3d at 595 n.15 (citations omitted).

In this case, Tavares has failed to state a First Amendment claim. Tavares' complaint fails to establish the first element in the analysis as Tavares' complaint and motion papers remain silent with respect to what religion Tavares was a member of and, by extension, what sincerely held religious practices were withheld from him during his IPC confinement. Tavares' general and conclusory claims that all IPC inmates were precluded from practicing religion are insufficient to raise a question of material fact. Without establishing a firmly held religious belief or identifying any interference with those practices, the discussion cannot further progress to an evaluation of whether isolating IPC residents from general population religious services was reasonable. See e.g., Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006) (articulating test that inmates "must show at the threshold that the disputed conduct . . . burdens his sincerely held religious beliefs," prior to advancing to the Turner test and "legitimate penological interests that justify the impinging conduct . . . .") (citations omitted). Accordingly, defendants' motion on this ground should be granted.


## C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 832 (1884). As

13

with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test." Jolly v. Coughlin, 76 F.3d 468,  480 (2d Cir. 1996) (citations omitted). Thus, "a prisoner may prevail only where he proves both an objective element – that the prison officials' transgression was sufficiently serious– and a subjective element – that the officials acted, or omitted to act, with a sufficiently culpable state of mind . . . ." Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted).

The objective prong can be satisfied by

> conditions of confinement . . . [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone . . . [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets.

Davidson v. Murray, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." Id. (citing Wilson v. Seiter, 501 U.S. 294, 304-05 (1991)).  The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind . . ., of deliberate indifference to inmate health or safety" Farmer, 511 U.S. at 834 (citations omitted).

In this case, Tavares' claims that he was confined in administrative segregation for twenty-three hours a day, only allowed to shower during his one hour long recreation, prohibited from wandering around outside of his cell, and being forced to pick and choose which amenities he wanted to avail himself to given his limited amount of time outside of his cell, are insufficient to support an Eighth Amendment claim.  Generally, administrative segregation conditions, even though "restrictive and . . . harsh, [are insufficient to establish

14

Eighth Amendment violations because] they are part of the penalty that criminal offenders pay for their offenses against society."  Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Tavares has failed to allege any deprivations of a single, identifiable human need. See Greene v. Furman, 610 F. Supp. 2d 234, 237 (W.D.N.Y. 2009) (holding that inmate's Eighth Amendment claim originating from his confinement in segregation was insufficient to state a constitutional claim as the allegations of denied exercise, showers and haircuts, did not represent atypical treatment, result in physical injury, or establish cruel and unusual punishment).  Moreover, to the extent Tavares contends that his inability to program was an Eighth Amendment violation, such contentions are meritless.  See Griffin v. Coughlin, 743 F. Supp. 1006, 1017 (N.D.N.Y. 1990) ("[Inmates] have no eighth amendment right to prison work and educational activities.") (citations omitted).  Tavares was given warmth, shelter, clothing, food, and exercise.  Tavares was allowed to shower throughout the week. Tavares was just upset that he did not have more freedom with his time and movement. However, such claims are insufficient to establish the objective prong of the analysis.

Accordingly, to the extent such Eighth Amendment claims are apparent, they should be dismissed.

### D. Fourteenth Amendment

### 1. Due Process

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. Amend. XIV § 1.  It is important to emphasize that due process "does not protect against all

deprivations of liberty. It protects only against deprivations of liberty accomplished without

due process of the law." Baker v. McCollan, 443 U.S. 137, 145 (1979) (internal quotation

and citations omitted). "A liberty interest may arise from the Constitution itself, . . . or it may

arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin,

545 U.S. 209, 221 (2005) (citations omitted). An inmate retains a protected liberty interest

to remain free from segregated confinement if the prisoner can satisfy the standard set forth

in Sandin v. Conner, 515 U.S. 472, 483-84 (1995).

### a. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which

requires protection. See generally Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994)

("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether

there exists a liberty or property interest which has been interfered with by the State; the

second examines whether the procedures attendant upon that deprivation were

constitutionally sufficient.") (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460

(1989)). The Second Circuit has articulated a two-part test whereby the length of time a

prisoner was placed in segregation as well as "the conditions of the prisoner's segregated

confinement relative to the conditions of the general prison population" are to be

considered. Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998). This standard

requires a prisoner to establish that the confinement or condition was atypical and

significant in relation to ordinary prison life. See Jenkins v. Haubert, 179 F.3d 19, 28 (2d

Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996). This analysis is applicable

to confinement for either punitive or administrative reasons. Arce v. Walker, 139 F.3d 329,

16

334-35 (2d Cir. 1998).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." Id. at 64–65 (citing Colon, 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." Id. at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. Id. (citing Colon, 215 F.3d at 231–32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short – e.g. 30 days – and there was no indication [of] . . . unusual conditions." Harvey v. Harder, No. 09-CV-154 (TJM/ATB), 2012 WL 4093792, at *6 (N.D.N.Y. July 31, 2012) (citing inter alia Palmer, 364 F.3d at 65-66).[5]

### i. Initial Placement in IPC

New York regulations require "chief administrative officer[s] of each [local or county]

---

[5] All unreported decisions are attached as exhibits to this Report-Recommendation.

17

correction facility [to] establish, implement, and maintain a formal and objective system for

the consistent classification of all inmates." N.Y. COMP. CODES R. & REGS. TIT. 9, § 7013.1.

These detailed regulations provide (1) various classification categories (Id. § 7013.4); (2)

provisions for a screening instrument which records information regarding the inmate's

physical and mental health, criminal history, incarceration history, and any other relevant

information (Id. § 7013.7); (3) requirements that classification be generally determined

within five business days of admission into the facility (Id. § 7013.8); and (4) conditions

under which an inmate's classification should be changed (Id. § 7013.9).

The Montgomery policies regarding classification reference the above regulations. Dkt.

No. 26-1 at 84. Specifically, the Montgomery policy states that initial screening and risk

assessment will occur and classification will generally occur within five business days. Id.

(citing N.Y. COMP. CODES R. & REGS. TIT. 9, § 7013). Additionally, the policy provides that

> INMATES WHO . . . HAVE BEEN ASSIGNED TO PROTECTIVE
> CUSTODY SEGREGATION AFTER THE COMPLETION OR
> DURING THEIR CLASSIFICATION SCREENING WILL BE
> SUBJECT TO A 23 HOUR A DAY LOCK IN STATUS AND WILL
> BE HOUSED SEPARATELY FROM GENERAL POPULATION,
> FOR A MANDATORY 60 DAY PERIOD OF TIME. AFTER 60
> DAYS YOU MAY REQUEST, IN WRITING, TO THE JAIL
> ADMINISTRATIVE OFFICER A CHANGE IN YOUR PROTECTIVE
> CUSTODY STATUS. IF IT IS DETERMINED THAT THERE IS NO
> FURTHER THREAT TO YOUR SAFETY, YOU WILL BE TAKEN
> OUT OF PROTECTIVE CUSTODY AND MOVED INTO GENERAL
> POPULATION. HOWEVER, IF IT IS DETERMINED THAT A
> THREAT TO YOUR SAFETY STILL EXISTS, YOU WILL BE KEPT
> IN PROTECTIVE CUSTODY AND YOUR SITUATION WILL BE
> RE-EVALUATED EVERY 30 DAYS AFTER UNTIL SUCH TIME
> THAT NO THREAT EXISTS.

Id. (citing N.Y. COMP. CODES R. & REGS. TIT. 9, § 7013) (emphasis in original). While not

specifically articulated in the policy, defendant Franko affirmed, and the jail intake forms

corroborated, that the same categories were used when classifying inmates as those articulated in the New York regulations. Most specific to this case was Tavares' past criminal history and sex offender status.

It is undisputed that initially, during classification, Tavares spent five days segregated for classification purposes. This time, in and of itself, is insufficient to establish a protected liberty interest.

Moreover, "[t]he [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Giano v. Senkowski, 54 F.3d 1050, 1053 (2d Cir. 1995) (internal quotation marks and citations omitted). The balancing test articulated in Turner v. Safely has been deemed uniquely instructive in considering whether "a prison regulation infringing on an inmate's constitutional rights is valid[,] so long as the regulation is reasonably related to the legitimate penological interests." Harvey, 2012 WL 4093792, at *7 (citing Turner, 482 U.S. at 89).

> The Turner Court determined that the four factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987).

A recent case in the Northern District of New York has already deemed the initial, temporary segregation of an inmate in a county jail during classification procedures valid and not an infringement upon due process protections. Harvey, 2012 WL 4093792, at *7. In that case, the county jail had identical initial classification policies also based on the New

York regulations.

> Until an inmate is screened for prior violence; propensity for
> victimization; possible enemies; behavior; and adjustment, the
> facility administrators have no way of knowing where the best place
> to house the inmate will be. Thus, a short classification period in
> administrative segregation in order to complete this objective is a
> completely reasonable restriction on an inmate's liberty.

Harvey, 2012 WL 4093792, at *7. For substantially similar reasons, to the extent that

Tavares challenges his initial five day classification period spent in segregation, such

contentions are insufficient to establish a due process violation. Accordingly, for these

reasons defendants' motion on this ground is granted.


### ii. Continued Placement in IPC

As previously explained, duration of confinement alone is not a dispositive factor in

determining whether due process rights were infringed. Defendants continually contend

that Tavares' confinement was administrative and prophylactic, not disciplinary. See e.g.

Colon v. Goord, No. 05-CV-129 (TJM/GJD), 2008 WL 783364, at *7 (N.D.N.Y. Mar. 20,

2008) (explaining that in the NYS Department of Corrections and Community Supervision

("DOCCS") facilities, which fall under different regulations but have analogous housing

classifications, "IPC is *not* a disciplinary unit . . . .") (emphasis in original). However, the

undisputed housing conditions for Tavares in IPC, particularly being locked in one's cell for

twenty-three hours a day, were more analogous to disciplinary confinement than

segregation. See e.g. Id. (explaining that in the DOCCS facilities "IPC inmates are afforded

more privileges and have less restrictions than Ad[ministrative] Seg[regation] inmates . . .

[who] are subject to the same restrictions as disciplinary S[pecial ]H[ousing ]U[nit] inmates .

. . .").  This was acknowledged by the State Commission of Corrections in the letter which it sent to defendant Franko indicating that IPC inmates should not be locked in their cells all day and that, instead, their privileges should be more akin to general population inmates.  See also Id. ("A review of [DOCCS] rules shows that many of the privileges accorded to general population inmates are also accorded to IPC inmates, albeit in a separate part of the facility.").  Further, the letter stated that additional lock-down is acceptable when there are "bona fide safety and security reasons (administrative segregation order with written documentation)," none of which were included in the present record or argued to have existed by defendants.  Accordingly, the fact that Tavares spent an additional 132 days in IPC, in the aforementioned environment, is sufficient to satisfy the Sandin atypical environment test so that a liberty interest, protected by due process, has been established.

As a form of administrative segregation, as opposed to disciplinary confinement, placement in IPC "requires only an informal, nonadversary review."  Smart v. Goord, 441 F. Supp. 2d 631, 641 (S.D.N.Y. 2006).  The procedural due process protections are minimal, dictating that the informal review must occur within a reasonable time, after the inmate has had some notice of the charges lodged against him and an opportunity to present his views to the administrator making the determination about segregation.  See e.g. McClary v. Kelly, 4 F. Supp. 2d 195, 212 (W.D.N.Y. 1998) (citing Hewitt . Helms, 459 U.S. 460, 460, 476 (1983)).  Moreover, the "prison officials must engage in periodic review of the decision . . . to ascertain whether a prisoner remains a security risk . . . [which is] supported by some evidence."  Id. at 212-13 (internal quotation marks and citations omitted).  Lastly, "administrative segregation may not be used as a pretext for indefinite confinement[, so] . . . periodic reviews [cannot be] a sham; the reviews must be meaningful and not simply

perfunctory."  Id. at 213 (citations omitted); see also Covino v. Vermont Dep't of Corr., 933 F.2d 128, 130 (2d Cir. 1991) (explaining that "[a]t some point, however, the administrative necessity for involuntary lock-up begins to pale . . . [and] smacks of punishment.").

Initially, Tavares received a document that indicated that because of his criminal history, he was to be placed in IPC.  Tavares refused to sign the form; however, that form served as notification of the administrative segregation as well as the initial opportunity for Tavares to express his displeasure with his classification.  Both appear to comply with the minimal procedures guaranteed by the Due Process clause.

The Montgomery policy indicated above details that the prison officials were supposed to review the IPC inmates' files after sixty days and then, if the danger were deemed to still persist, every thirty days thereafter.  Moreover, inmates were allowed, after the initial sixty day period, to seek review of their classification in IPC.  After approximately sixty days in IPC, Tavares filed a grievance complaining about his IPC placement, in an attempt to comply with the facility regulations.[6]  The grievance was returned to him indicating that Tavares was to remain in IPC for his own safety due to his criminal history and designation as a sex offender.  Tavares contends that he continued to file documentation grieving his classification; however, no such documentation was provided with the pending motions.

Liberally construing the facts in the light most favorable to Tavares though, despite the lack of paperwork, it appears that Tavares availed himself of the opportunity provided to him

---

[6] Administrative segregation housing decisions are not grievable.  See  N.Y. COMP. CODES R. & REGS. TIT. 9, § 7032.2 ("[A]dministrative segregation housing decisions shall not be the subject of a grievance.").  However, even though Tavares filed the incorrect paperwork it appears undisputed that defendants received notification of his displeasure with the IPC confinement.

by Montgomery, and its policies, to seek review of his classification on a regular basis. Nothing in defendant Franko's affidavit indicates that facility staff engaged in the periodic review of Tavares' confinement outlined in the facility's procedures or acknowledges whether they received the alleged  correspondence from Tavares, or how they responded to it.  While a "lack of sepcificity . . . [regarding] the dates of the reviews *or* the specific decision[s]," is not required, it is clear that there needs to be some evidence that a meaningful review occurred.  See Colon, 2008 WL 783364, at *9 (explaining that a meaningful review occurred even where the inmate received short, cursory memoranda "indicating that his circumstances had not changed, and his IPC status was being continued," as the record demonstrated through several affidavits that the inmate's case was carefully and regularly contemplated and defendants unsuccessfully attempted to transfer him on several occasions to a safer facility where housing in the general population was possible) (emphasis in original).  No such evidence presently exists on the record before the Court.

   Furthermore, despite the fact that the State Commission on Correction indicated that, with appropriate documentation, administrative confinement including twenty-three hour a day lock down for safety and security reasons was permissible and defendant Franko contends in his affidavit that he felt such security concerns were present, defendants failed to produce any such documentation which would have apparently legitimized the continued confinement in IPC.  Accordingly, Tavares' "allegations raise the possibility that []he was confined in IPC without meaningful review or sufficient process," and defendants have not provided sufficient factual support to quell such disputes in material facts.  Smart, 441 F. Supp. 2d at 642.

Additionally, to the extent that defendants may rely on the <u>Turner</u> analysis above to relieve them of responsibility in the face of a potential constitutional infringement, such reliance is misplaced.  First, it does not appear that defendants followed their own regulations with respect to periodic reviews of the inmates; thus, the <u>Turner</u> analysis is inappropriate.  <u>See</u> <u>Nolley v. County of Erie</u>, 776 F. Supp. 715, 739 (W.D.N.Y. 1991) (explaining that the <u>Turner</u> analysis is applicable where it is argued that "an otherwise valid regulation impinges on a plaintiff's constitutional rights, but [not] where the defendants fail[] to follow even their own regulations.").  However, it is unclear that defendants did not perform any kind of review, so a question of material fact exists and both parties' motion for summary judgment should be denied.

Second, even assuming the <u>Turner</u> analysis did apply, defendants have still failed to proffer sufficient evidence to establish the absence of a question of material facts. Defendants repeatedly state that housing inmates with a criminal history of sex crimes or with a sex offender status was not punitive, but rather prophylactic, as these inmates represented a risk to safety and security of the facility.  Defendants have proffered an affidavit from Franko which indicates that inmates with sex offender status were generally more vulnerable and susceptible to victimization, the population of the jail was increasing without a concomitant increase in the number of corrections officers, and that increase was attributed primarily to larger numbers of sex offenders entering custody.  Other districts have deemed an inmate's sex offender status to represent a safety issue requiring protective custody. <u>See</u> <u>e.g.</u> <u>Tucker v. Royce</u>, Nos. 09CV35-MPM-JAD, 09CV106-MPM-JAD, 10CV4-MPM-JAD, 2011 WL 541116, at *6 (N.D.Miss. Feb. 8, 2011) (denying Eighth Amendment claims regarding IPC classification because the inmate "was placed in [IPC] for

a reason: as a sex offender, he was vulnerable to assault from other inmates . . . .").

Moreover, the Second Circuit has discussed, though not explicitly commented on the

constitutionality of the policy of offering IPC to inmates with sex offender histories.

See Arnold v. County of Nassau, 252 F.3d 599, 601 (2d Cir. 2001) (explaining in an action

alleging failure to protect, and not a due process violation, that the inmate was initially

placed into IPC "pursuant to 'Warden's Order: Sex Crimes,' an order designed to assure

that inmates charged with sex crimes are removed from the general prison population

because they are a greater risk of assault by other inmates.").

However, the present record proffers nothing more than conclusory assertions about the

circumstances faced by defendants at Montgomery.  While safety concerns for inmates

such as Tavares could represent a legitimate penological interest, defendants have failed to

provide any documentation regarding information including specific numbers of the inmate

population and the percentage of sex offenders previously housed at Montgomery, that

population's anticipated increase in comparison to the rest of the incoming inmate

population, or the number of attacks on sex offenders or those with a sexually based

criminal history.  See Smart, 441 F. Supp. 2d at 645 (denying qualified immunity because

defendants failed to demonstrate anything more than "conclusory statements" about safety

concerns essentially providing the court with "no showing that there was any reason to fear

for [the inmate's] personal safety.").

Furthermore, Tavares' inmate file evidences that he was previously housed at

Montgomery on three occasions – all of which occurred after being convicted of violent

sexual assaults and labeled as a sex offender – and was never identified a victim or placed

in IPC.[7]  The last such incarceration occurred in July of 2010, and defendants contend that

the influx of the inmate population occurred within months thereafter, thus it is unclear

whether Tavares was still incarcerated during the initial influx and, if so, why, at that time,

he was not reclassified.  Regardless, on the present record, Tavares' history at Montgomery

during his prior incarcerations seem inconsistent with defendants' present claims that all

sex offenders were prone to victimization and thus were required to be housed in IPC for

prophylactic measures.   Accordingly, defendants have failed to provide sufficient evidence

to establish that no question of material fact exists regarding the reasons defendants are

proffering for segregating sex offenders to IPC.  As a question of material fact remains

regarding the legitimacy of defendants' policy, both motions for summary judgment are

denied.


### b. Substantive Due Process

Liberally reading Tavares' complaint, it appears he has also alleged a substantive due

process claim concerning his placement and continued confinement in IPC based on his

criminal history.   "Substantive due process protects individuals against government action

that is arbitrary, conscience-shocking, or oppressive in a constitutional sense . . . but not

against government action that is 'incorrect or ill-advised'"  Lowrance v. Achtyl, 20 F.3d 529,

537 (2d Cir.1994) (internal citations omitted).  "To establish a violation of substantive due

_____

[7]  Defendants contend that classification was based on a non-discriminatory system
which provided points to incoming inmates based on a variety of factors articulated above.
It is important to note that a large number of points were awarded for current or past
incarcerations for <u>either</u> violent felonies <u>or</u> sexual assaults.  The form did not distinguish
between the two.  Accordingly, the classification system indicated that an inmate with
either of these propensities represented a risk requiring increased supervision.

process rights, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Okin v. Villiage of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 431 (2d Cir. 2009) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).  As already observed by the Northern District of New York, "[v]ery few conditions of prison life are 'shocking' enough to violate a prisoner's right to substantive due process.  In Sandin v. Conner, the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs."  Samms v. Fischer, No. 10-CV-349 (GTS/GHL), 2011 WL 3876528, at *12 (N.D.N.Y. Mar. 25, 2011) (citations omitted).

In this case, while the actions of defendants in articulating a policy which summarily housed a population of inmates in IPC pursuant to potentially legitimate concerns related to inmate facility and security could be categorized as incorrect or ill-advised, it does not appear that such a policy was arbitrary, conscience shocking, or constitutionally oppressive. Moreover, given the limited number of recognized circumstances where substantive due process is advanced, and the dissimilarity between those instances and the present claim, to the extent that Tavares is attempting to advance such due process arguments, they are insufficient to establish a constitutional claim.

### 2.  Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  Essential to that protection is the guarantee that similarly situated persons be treated equally.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the

Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination."). "[A]bsent classification by race, alienage or national origin, legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." Vargas v. Pataki, 899 F. Supp. 96, 98 (N.D.N.Y. 1995) (citations, quotation marks, and internal alterations omitted). Accordingly, strict scrutiny shall only be employed "where the classification involves a fundamental right or a suspect class." Id. (citations and quotation marks omitted).

If an inmate is unable to establish membership in a protected class, "the Supreme Court has recognized 'class of one' claims, where the plaintiff must prove that he was intentionally treated differently from others similarly situated without a rational basis for the difference in treatment." Fortunatus v. Clinton County, N.Y., No. 12-CV-458 (RFT), 2013 WL 1386641, at *11 (N.D.N.Y. Apr. 4, 2013) (citing Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). Such plaintiffs

> must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves . . . [and] must establish that (1) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006) (citations omitted). "Generally, whether parties are similarly situated is a fact-intensive inquiry," best suited for the jury, unless "no reasonable juror could find that the persons to whom plaintiff compares itself are similarly situated," and then summary judgment is appropriate. Id. (citations omitted).

28

Prisoners are not a part of a suspect class.  <u>Scott v. Denison</u>, 739 F. Supp. 2d 342, 362 (W.D.N.Y. 2010) (citations omitted); <u>Lee v. Governor of State of New York</u>, 87 F.3d 55, 60 (2d Cir. 1996) ("[P]risoners either in the aggregate or specified by offense are not a suspect class . . . .").  "[S]ex offenders [also] do not compromise a suspect or quasi-suspect class . . . [thus any] allegedly different treatment is subject to rational basis scrutiny, that is, it must be rationally related to a legitimate state interest."  <u>Taylor v. New York State Dep't of Corr. Servs.</u>, No. 07-CV-1288 (NAM/RFT), 2009 WL 3522781, at *2 (N.D.N.Y. Oct. 29, 2009) (citations omitted).

In this case, a question of fact remains as to Tavares' Equal Protection claim.  Both sides agree that Montgomery's policy was to summarily classify and house all sex offenders in IPC for their own safety.  Therefore, sex offenders were treated differently from all other inmates who were generally housed in, and accorded the amenities of, general population.  Tavares has successfully established a high degree of similarity between himself and the other sex offenders and such similarity and difference in treatment are undisputable so that mistake is not a reasonable possibility.

As previously discussed, defendants have proffered affidavits indicating that their policy of confining sex offenders and those with sexual offenses in their criminal history to IPC was based on a legitimate concern for safety in the prison given the increasing number of inmates and stagnant number of staff.  Furthermore, for the reasons articulated above, there are questions of fact which surround the legitimacy of Montgomery's policy given the lack of factual and statistical evidence.  Such an inquiry is further confused by Tavares' prior experiences at Montgomery where, despite having the same criminal history, he was never before placed or transferred into IPC.  Conversely, if defendants' claims are proven to

be more than conclusory, a rational basis may be deemed to exist.  Accordingly, both

defendants' and Tavares' motions should be denied on this ground.


### E. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity.  Qualified immunity

generally protects governmental officials from civil liability "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person

would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F.

Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov.

10, 2003).

> [A] decision dismissing a claim based on qualified immunity at the
> summary judgment state may only be granted when a court finds
> that an official has met his or her burden demonstrating that no
> rational jury could conclude (1) that the official violated a statute or
> constitutional right, and (2) that the right was clearly established at
> the time of the challenged conduct.

Coollick v. Hughes, 699 F.2d 211, 219 (2d Cir. 2012) (quoting Ashcroft v. al-Kidd, 131 S.Ct.

2074, 2080 (2011)) (internal quotation marks omitted).  The Supreme Court has granted

district courts "discretion to decide which of the two prongs . . . to tackle first [in order to] . . .

save[] judicial resources by avoiding unnecessary decisions whether certain conduct

violates a constitutional or statutory right, which it is beyond reproach that the conduct was

not objectively unreasonable in light of existing law."  Id. (internal quotation marks and

citations omitted).

A constitutional right is clearly established if it is both reasonably specified and affirmed

by both Supreme Court and Second Circuit case law and understood to be viewed by a

reasonable defendant as unlawful under the status of the law at the relevant time in question.  Looney v. Black, 702 F.3d 701, 706 (2d Cir. 2012).  Such an inquiry is context-specific, looking at "the contours of the right" which is alleged to be protected so that "the very action in question [need not] ha[ve] previously been held unlawful; but . . . in the light of pre-existing law the unlawfulness must be apparent."  Doninger v. Niehoff, 642 F.3d 334, 345-46 (2d Cir. 2011) (internal quotation marks and citations omitted).

Defendants contend that their decision to institute a policy segregating all inmates labeled as sex offenders or with sexually violent crimes in their criminal histories into IPC is protected by the qualified immunity doctrine.  While there is no New York regulation concerning the placement or review of an inmate in local custody being placed into IPC, or a case which has been decided presenting identical facts, the constitutional rights surrounding an individual's right to due process and to remain housed in a manner presenting neither atypical nor significantly different circumstances than ordinary prison life were clearly established at the time of the case. See Sandin v. Conner, 515 U.S. 472 (1995); Wright v. Coughlin, 132 F.3d 133, 136-38 (2d Cir. 1998) (discussing how duration and conditions of confinement serve to illustrate the atypical and significant requirement created by Sandin).  Moreover, the right of an inmate in administrative segregation to receive informal, periodic reviews was also clearly established.  See Hewitt, 459 U.S. at 476, 477 n.9 (deeming informal, non-adversarial procedures sufficient for administrative segregation and requiring periodic and meaningful reviews of continued confinement to preclude such confinement as a pretext for indefinite punishment).  As was an inmate's right not to be treated different than others unless a rational basis existed. See Lee v. Governor of State of New York, 87 F.3d 55, 60 (2d Cir. 1996) (citing City of Cleburne v.

31

Cleburne Living Ctr, Inc., 473 U.S. 432, 440 (1985)).  Accordingly, it is apparent that

Tavares' Fourteenth Amendment rights to Due Process and Equal Protection were clearly

established at the time in question.

Defendants contend that because of increased inmate populations, legitimate concerns

for the safety and security of the institution, inmates, and staff compelled IPC for inmates

like Tavares.  Similar scenarios make it clear that a holding an inmate in segregation, under

adverse conditions, without a legitimate basis, and without review is unreasonable.

See Smart v. Goord, 441 F. Supp. 2d 631, 645 (S.D.N.Y. 2006) (denying qualified immunity

where defendants "made no showing with regard to either the conditions of . . . confinement

or the extent to which confinements of similar duration may or may not be typical . . . .,"

proffered only conclusory allegations about asserted safety concerns, and failed to defeat

arguments that procedural protections afforded to inmate were anything more than "hollow

formalit[ies].").  Despite defendants' proffers to the contrary, at this juncture, for the reasons

stated above, the undersigned cannot conclude that defendants' have met their burden in

demonstrating that the policy was rationally related to a legitimate penological objective.

Without proof of a compelling safety concern, neither defendants' actions can be deemed

reasonable given the case law and constellation of circumstances surrounding Tavares' IPC

confinement.

Accordingly, it is recommended that defendants' motion on this ground be denied.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Tavares' motion for summary judgment (Dkt. No. 23) is **DENIED**; and

2. Defendants' cross-motion for summary judgment (Dkt. No. 26) is:

   A. **GRANTED** with respect to Tavares' First and Eighth Amendment claims, as well as any claims for due process stemming out of Tavares' initial segregation for five days during classification ; and

   B. **DENIED** in all other respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. §636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  May 14, 2013
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge